Brian EATZ, Edward McMillan, Peter Albrechtsen, Sonny Pascale, individually on their own behalf, and on behalf of all others similarly situated, Plaintiffs–Appellees–Cross–Appellants,

v.

The DME UNIT OF LOCAL UNION NUMBER 3 OF the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO and Local Union Number 3 of the International Brotherhood of Electrical Workers, AFL–CIO, Defendants–Cross–Appellees.

New York Racing Association, Inc., Defendant–Appellant–Cross–Appellee.

Nos. 1020, 1300, Dockets 91–9161, 91–9163.

United States Court of Appeals, Second Circuit.

Argued March 23, 1992.

Decided Aug. 7, 1992.

H. Richard Schumacher, New York City (Samuel Estreicher, F. Peter Phillips, Cahill Gordon & Reindel, on the brief), for defendant-appellant-cross-appellee.

Wendy E. Sloan, Hall & Sloan, New York City, for plaintiffs-appellees-cross-appellants.

Before: NEWMAN and CARDAMONE, Circuit Judges, and SAND, District Judge.*

JON O. NEWMAN, Circuit Judge:

Federalism inevitably generates a number of close questions as to whether a particular dispute is governed by federal or

---

* The Honorable Leonard B. Sand of the United States District Court for the Southern District of New York, sitting by designation.

state law and whether it should be resolved in federal or state court. Often such questions border on the metaphysical. Occasionally they arise in a context barren of guiding precedent. Such is this appeal. The issue presented arises in the aftermath of the discretionary decision of the National Labor Relations Board to decline to exercise its jurisdiction over a category of employers—in this case, an association operating thoroughbred horse racing tracks. The question is whether a federal court retains the jurisdiction it would have had before the Board's declination to adjudicate an employee's claim that his union has breached its duty of fair representation.

The issue arises on an interlocutory appeal by the New York Racing Association Inc. (the "Association") from the portion of the March 29, 1991, order of the District Court for the Eastern District of New York (Reena Raggi, Judge), denying its motion for dismissal or in the alternative summary judgment in a suit brought by mutuel clerks who are employees of the Association. The clerks are members of defendant union Local 3 (the "Union") of the International Brotherhood of Electrical Workers and the Union's bargaining unit, defendant Division of Mutuel Employees ("DME"). Plaintiffs cross-appeal from the portion of the order denying them leave to file an amended and supplemental complaint.

That the jurisdictional issue is close is evidenced by the conflicting views of the two district judges who have faced the issue in this very litigation. That the issue borders on the metaphysical will become evident from our discussion. Unguided by any authoritative precedent on this most obscure issue, we conclude that federal jurisdiction is lacking and therefore reverse.

## BACKGROUND

1. *The Statutory Framework.* Section 9(a) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 159(a) (1988), provides that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representa-

tives of all the employees in such unit for the purposes of collective bargaining...." The authority of a union to act as the exclusive bargaining representative of all employees in the appropriate unit has long been held to imply "a statutory duty fairly to represent all of those employees." *See Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). This federal law duty of fair representation is enforceable in a district court. *See Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989).

Section 14(c)(1) of the Act, 29 U.S.C. § 164(c)(1) (1988), authorizes the Board "in its discretion" to "decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction." Implementing this authority, the Board has formalized its preexisting rule, stating that it "will not assert its jurisdiction in any proceeding under sections 8, 9, and 10 of the Act [NLRA] involving the horseracing and dogracing industries." 29 C.F.R. § 103.3 (1991); *see New York Racing Association Inc. v. NLRB*, 708 F.2d 46, 48 (2d Cir.) (discussing NLRB rule), *cert. denied*, 464 U.S. 914, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983); *Pari Mutuel Clerks Union of Louisiana, Local 328 v. Fair Grounds Corp.*, 703 F.2d 913, 916–17 n. 1 (5th Cir.) (providing history of NLRB rule), *cert. denied*, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983).

2. *The Facts.* The Association operates three thoroughbred horse racing tracks within the state of New York. Mutuel clerks staff its pari-mutuel wagering facilities, working primarily at betting windows selling or redeeming wagering tickets, or performing related support functions. Until 1977, the Association employed only two categories of mutuel clerks: the full-time "Regulars" and the part-time "Extras." In 1977, the labor contract between the Association and DME's predecessor recognized a new full-time category termed "Provisionals." This new category remained op-

erative in the 1979 and 1982 collective bargaining agreements, but was renamed "New Regulars." Regulars are distinguished from New Regulars in that they achieved their full-time employment status before the effective date of the 1977 agreement. After 1977, all collective bargaining agreements have maintained this two-tiered system for full-time mutuel clerks, providing Regulars with higher wages and more favorable benefits than New Regulars. As of late 1986, New Regulars continued to be a numerical minority in the DME. Plaintiffs, consisting of New Regular mutuel clerks, have brought two actions to challenge this two-tier system of compensation.

In 1983, the plaintiffs brought a class action against the Association, Local 3, and their bargaining unit, the DME ("*Eatz 83*"). Plaintiffs alleged that the Union had breached its duty of fair representation in negotiating and administering its 1977, 1979, and 1982 collective bargaining agreements by unfairly discriminating against the putative class of recently hired mutuel clerks. In addition, the plaintiffs alleged that the Association colluded with the union during these negotiations, to the detriment of the putative plaintiff class. Judge Costantino dismissed the complaint as time-barred. On appeal, this Court held that the allegations concerning the negotiation of the 1977, 1979, and 1982 collective bargaining agreements were time barred, but reversed in part and remanded to allow the plaintiffs to allege four specific instances of post-limitations period conduct, and any other similar post-limitations conduct. *Eatz v. DME Unit of Local Union No. 3*, 794 F.2d 29 (2d Cir.1986) ("*Eatz I*").

On remand, the plaintiffs alleged the four specific instances identified in *Eatz I* and attempted to allege a claim based on the discriminatory negotiation and administration of the 1985 collective bargaining agreement. Judge Costantino allowed amendment to allege the first four claims but denied leave to amend to allege the claim based on the 1985 agreement.

Following negotiation of the next bargaining agreement in March 1988, the plaintiffs filed another complaint ("*Eatz 88*"), alleging in essence a continuation of the same breaches of duty set forth in the prior action. The two actions were consolidated. By his September 6, 1989, order, Judge Costantino dismissed the fair representation claim against the Association, ruling that the NLRB's decision not to exercise its jurisdiction over the horse racing industry divested the courts of jurisdiction over the fair representation claims. When the NLRB declines to assert jurisdiction, the Judge reasoned, the matter becomes subject to otherwise preempted state law. Relying on Judge Costantino's own recently announced holding, the Association moved for dismissal and/or summary judgment on behalf of the DME and the Union. While the motion was pending, Judge Costantino died, and the case was reassigned to Judge Raggi.

The plaintiffs cross-moved for reconsideration of the prior rulings dismissing the Association and the denial of their motion for leave to amend. On March 29, 1991, Judge Raggi rejected the prior ruling on the fair representation claim, but left undisturbed the denial of leave to amend to include the 1985 claim. Before the District Court, the parties believed and represented to the Court that the employer and a majority of the employees had agreed to recognize the Union as bargaining agent without the intervention of either the NLRB or the New York State Labor Board. Upon further research, the Association discovered that the Union's predecessor had in fact been certified as bargaining agent by the state labor board. In reliance on the erroneous representation, Judge Raggi found that the Union's exclusive bargaining authority was not conditioned on any action by the NLRB or a state labor board. The Court explained that

where, as here, a majority of employees operating in an industry affecting interstate commerce has designated a union as their bargaining agent; where the employer has recognized that union as the exclusive representative of the employees consistent with [29 U.S.C.] § 159(a); and where the union has accepted that designation and attempted to bargain on behalf of the employees, the union oper-

ates under a federal duty to provide fair representation regardless of whether the NLRB would have adjudicated any disputes as to exclusive representation had they arisen.

Judge Raggi reasoned that because the duty of fair representation is derived from the Union's status as exclusive bargaining agent, the Board's declination of jurisdiction did not affect the union's federal duty of fair representation.

Accordingly, the District Court denied the defendants' motion for summary judgment on the claims in *Eatz 83* and *Eatz 88* relating to the DME's alleged violation of its duty of fair representation, reversed the earlier ruling in favor of the Association on these claims, and reinstated the claims. The District Court then certified for interlocutory appeal under 28 U.S.C. § 1292(b) (1988), that portion of its order denying in part the Association's summary judgment motion brought on behalf of its co-defendant, the DME and the Union.

### DISCUSSION

#### I. The Association's Appeal

A. *Analytical framework.* The parties and the District Courts have discussed the issue presented by the Association's appeal as an issue of federal court subject matter jurisdiction. That characterization is only partly true, and it will be helpful at the outset to set out the framework for analysis of the issues on this appeal. The plaintiffs came to federal court alleging a breach of what they claimed was a federal law duty of fair representation. They were met with the defense that the Board's declination of jurisdiction under section 14(c)(1) removed the federal law underpinning of both the Union's status as collective bargaining agent for the employees and the implied duty fairly to represent the employees. Whether or not that duty remains grounded in federal law is a federal question over which a district court has jurisdiction. *See Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). If federal law no longer governs the alleged duty of fair representation, than the plaintiffs have failed to state a claim, and this claim for

relief is dismissable under Fed.R.Civ.P. 12(b)(6). That would leave pending only a state law claim based on whatever state law the plaintiffs could invoke to support a duty of fair representation in an industry over which the Board has declined jurisdiction. There would be no independent federal jurisdiction for that state law claim (complete diversity not being claimed), and it would not be appropriate to exercise pendent jurisdiction, the federal claim having failed at the outset. The district court would then be obliged to dismiss the state law claim under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. The issue on which Judges Raggi and Costantino disagreed is whether a duty of fair representation continues to exist under federal law after the Board's declination of jurisdiction.

B. *The merits.* When Congress reacted to the "no man's land" created by the Supreme Court's decisions in *Guss v. Utah Labor Relations Board,* 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957), *Amalgamated Meat Cutters v. Fairlawn Meats, Inc.,* 353 U.S. 20, 77 S.Ct. 604, 1 L.Ed.2d 613 (1957), and *San Diego Building Trades Council v. Garmon,* 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618 (1957), holding that state authority was preempted in fields covered by the NLRA even when the NLRB did not exercise its jurisdiction, it made no explicit provision as to the body of law that the states were to apply in exercising their authority under section 14(c). If the context in which section 14(c) emerged were not examined, arguments could be constructed either way. On the one hand, it could be argued that sound labor policy would better develop if the states were obliged to apply federal law in exercising their newly-ceded authority. On the other hand, it could be argued that the Board's determination that labor disputes in a particular industry had so little effect on interstate commerce as not to warrant the Board's exercise of jurisdiction should leave the states free to fashion their own law to govern such disputes.

In fact, the legislative context makes it reasonably clear that Congress expected

the states to apply state law. Section 14(c) emerged as a compromise between widely differing versions passed by the Senate and the House. The Senate version would have explicitly required state agencies to apply federal law. S. 1555, 86th Cong., 1st Sess. § 701 (1959); *see* Benjamin Aaron, *The Labor–Management Reporting and Disclosure Act of 1959*, 73 Harv.L.Rev. 1086, 1091 (1960). The House version contained no such requirement. *See id.* at 1092. The Conference version substantially adopted the House approach, notably dispensing with any requirement that the states apply federal law. *See id.* at 1092–93. The key senators fully understood the significance of the abandonment of the Senate bill's requirement that the states should apply federal law. *See* 105 Cong.Rec. S16,255 (daily ed. Sept. 2, 1959) (statement of Senator Kennedy); *id.* at S16,419 (daily ed. Sept. 3, 1959) (remarks of Senator Goldwater). Indeed, opponents of the measure complained that it placed "no limitation whatsoever upon the Board's power to deny employees and employers the protection of the National Labor Relations Act." *See id.* H14,205 (daily ed. Aug. 11, 1959) (remarks of Rep. Thompson, entering speech of Speaker Rayburn).

Though no federal court decision appears to have faced the issue of what law applies to a labor dispute affecting commerce sufficiently to be within the authority of the NLRB but so insubstantially as to warrant the exercise of the NLRB's discretionary declination of jurisdiction, we are persuaded that state law applies. *See* Aaron, *supra,* at 1097, 1098; Frank I. Michelman, *State Power to Govern Concerted Employee Activities,* 74 Harv.L.Rev. 641, 646 (1961).

The construction of section 14(c) to authorize states to apply state law does not necessarily end our inquiry. It would be possible to construct a regime in which state law supplies the rule of decision for resolution of particular disputes involving representation and unfair labor practices after Board declination of jurisdiction, subject to some continuing force of fundamental federal labor law. For example, it could be argued that the fundamental guarantee

of section 9(a), assuring that a union "designated or selected for the purposes of collective bargaining by a majority of the employees ... shall be the exclusive representative[ ] of all the employees," remains in force. If this premise were sound, it would then be an entirely reasonable inference that the implied duty of fair representation, which derives from the authority to act as exclusive bargaining agent, remains grounded in federal law.

The premise has much to commend it. In the first place, the enactment of section 14(c)(1) did not in terms amend section 9(a), and repeals by implication, even partial repeals, are not favored. Secondly, while many in Congress understood that a declination of Board jurisdiction would permit application of state law, it is not so certain that they understood that state law could operate not only to make the representation and unfair labor practice determinations formerly made by the Board but also to dispense entirely, if the state saw fit, with the fundamental collective bargaining authority of a union that has won majority support. But answers to these concerns suggest themselves. First, if the Board's declination works a curtailment of section 9(a), it is at most a suspension of authority, not a repeal. The Board can always reassert its jurisdiction, and any indication that states were fashioning state law to deny a union collective bargaining authority despite its majority support, or to grant exclusive bargaining status without imposing a concomitant duty of fair representation, would surely attract the Board's attention and, if jurisdiction were not reasserted, the attention of Congress. Second, the toleration of state law authority was made in full awareness of the general protection available throughout the states for the collective bargaining process. Third, a patchwork pattern of federal law protecting some fundamental aspects of labor law and state law operating only on less fundamental issues would breed endless disputes as to the demarcation between federal and state law boundaries. Though the issue is not free from doubt, we think that Congress intended to permit state law to hold

full sway in the event of Board declination, with Board and congressional oversight as the available remedy if the exercise of state law authority inadequately protected the collective bargaining process.

We are mindful of the Supreme Court's decision in *Breininger,* upholding district court jurisdiction over an unfair representation claim despite the Board's discretionary decision not to consider the union's conduct actionable as an unfair labor practice. But that decision rested on the principle that the Board's unfair labor practice jurisdiction was not exclusive of an unfair representation claim. The Board's decision not to file an unfair labor charge in that particular instance did not leave any aspect of that dispute to a state. The force of section 9(a) and the implied duty of fair representation remained grounded in federal law. By contrast, the declination of jurisdiction under section 14(c)(1) leaves the Union's authority in this case dependent on state law, and leaves equally dependent on state law whatever duty of fair representation that authority implies. *See Baker v. Board of Education,* 70 N.Y.2d 314, 320, 520 N.Y.S.2d 538, 541, 514 N.E.2d 1109, 1112 (1987) (recognizing state law duty of fair representation for public sector unions excluded from coverage of NLRA); *Civil Service Bar Ass'n v. City of New York,* 64 N.Y.2d 188, 196, 485 N.Y.S.2d 227, 230–31, 474 N.E.2d 587, 590–91 (1984) (same).

■ We also recognize that the Board's declination of jurisdiction does not impair the jurisdiction of a district court to adjudicate a claim for breach of a collective bargaining agreement under section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185 (1988), *see Pari Mutuel Clerks Union of Louisiana, Local 328 v. Fair Grounds Corp.,* 703 F.2d at 916–19, or a claim for violation of union democracy rights under section 102 of the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 412 (1988), *see Stein v. Mutuel Clerks' Guild of Massachusetts, Inc.,* 560 F.2d 486, 490 (1st Cir.1977). But there is a difference. Section 301 of the LMRA is explicitly a grant of jurisdiction to the district

courts, and section 102 of the LMRDA is explicitly an authorization of a cause of action in the district courts; section 14(c)(1) is explicitly a grant of authority to the Board to decline jurisdiction in favor of the states. It is arguable that the declination of jurisdiction under section 14(c)(1) should partially suspend section 301 and section 102 to the same extent that we hold it partially suspends section 9(a). But there is no reason to believe that Congress expected section 301 claims or section 102 claims, after Board declination, to be resolved by reference to state law, and there is considerable basis for believing that it did have that expectation with respect to all aspects of representation and unfair labor practice matters. The one case we have located that considered a hybrid section 301/fair representation action after Board declination upheld federal court jurisdiction over the section 301 claim but expressed no view on the source of law applicable to the unfair representation claim. *See Richards v. Local 134,* 790 F.2d 633 (7th Cir.1986). In our view, the unfair representation claim in *Richards* would have been governed by state law, and the District Court would have been exercising pendent jurisdiction over it.

We therefore conclude that the plaintiffs' unfair representation claim should have been dismissed for failure to state a valid federal law claim and that, to the extent that the claim rests on state law, the District Court lacked jurisdiction to decide it.

II. The Plaintiffs' Cross–Appeal

The plaintiffs cross-appeal from the denial of their motion to file an amended and supplemental complaint in *Eatz 83* to include allegations relating to the negotiation and application of the 1985 collective bargaining agreement. Even if we may deem this issue within the scope of this interlocutory appeal, we dismiss the cross-appeal as moot, in view of our ruling on the appeal.

CONCLUSION

The plaintiffs' cross-appeal is dismissed. The portion of the District Court's order denying the motion for dismissal or, in the

alternative, summary judgment on the fair representation claim is reversed, and the action is remanded with directions to ·dismiss the complaint for lack of jurisdiction.